Henry R. Kaufman, P.C.
Henry R. Kaufman (HK-7283)
11 East 44th Street, Suite 900
New York, NY 10017
(212) 880-0842
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

BRUCE HELANDER,                                  )
                                                 )
    Plaintiff and Counterclaim Defendant,        )
                                                 )        **07-CV-8058 (LTS)**
             - v -                               )             **ECF**
                                                 )          **ANSWER**
RON PARKER;                                       )     **AND COUNTERCLAIMS**
PARKER AND PARKER CONSULTING,                    )
                                                 )
    Defendants and  Counterclaimants.            )
_____          )

        Defendants Ron Parker and "Parker and Parker Consulting," by their attorneys,

Henry R. Kaufman, P.C., for their Answer to the Complaint herein, allege as follows:


        1.      Admit the allegations contained in paragraph 1 but respectfully refer this

Court to the Complaint for the precise language and content therof.


                        JURISDICTION AND VENUE

        2.      Admit the allegations contained in paragraph 2, except deny knowledge or

information sufficient to form a belief as to the truth of the allegations regarding the

amount alleged to be in controversy.


                                PARTIES

        3.      Deny knowledge or information sufficient to form a belief as to the truth

of the allegations contained in paragraph 3.


                                    1

4.     Admit the allegations contained in paragraph 4.

5.     Admit the allegations contained in paragraph 5, except aver that Defendant Ron Parker's closely held consulting firm was originally incorporated in New York under the name Parker and Parker, Inc., and is currently doing business in New York as Parker and Parker Consulting, Inc. (hereafter "Parker and Parker").

6.     Deny the allegations contained in paragraph 6, except admit that Defendant Ron Parker (hereafter "Parker" or "Defendant Parker") and Parker and Parker were at the time of the events alleged, engaged in the business of art consulting and art publishing, among other business activities, including real estate investment.

## BACKGROUND

7.     Admit the allegations contained in paragraph 7, except aver that the relationship between the parties had been one of close friendship and that Defendant Parker was also Plaintiff's art publisher and had distributed 27 limited editions of his work ("Love Letters") throughout the United States.

8.     Deny the allegations contained in paragraph 8, except admit that, in connection with and in furtherance of the business activities of Parker and Parker, Defendant Parker wrote Exhibit A and emailed it to Plaintiff, and that a copy of Exhibit A was emailed to Don Binns (hereafter "Binns").  Binns was, among other things, an art gallery owner and art publisher with whom Defendants had ongoing or potential future business relationships in both art and real estate, and respectfully refer the Court to Exhibit A for the precise content thereof.  (A legible copy of Exhibit A is annexed hereto as Exhibit 1, and hereafter referred to as "Exhibit 1".)

9.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9.

10.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10.

11.     Deny the allegations contained in paragraph 11, except admit that, during the relevant time period, Defendants were attempting to work with both Plaintiff and Binns to advance all of the parties' mutual interests in connection with significant business opportunities in the art field and also in connection with a pending effort to work out an unresolved business dispute between Plaintiff and Defendants regarding a real estate project in Pennsylvania in which Plaintiff and Defendants both had a business relationship.

12.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12.

13.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13, except admit, upon information and belief, that a business meeting in New York had been proposed among the relevant parties, including Plaintiff, Parker and Binns, in connection with an effort that had been initiated by Parker to arrange for a possible sale of Simic Galleries to Binns.

14.     Deny the allegations contained in paragraph 14, except admit that Parker had sent various communications attempting to arrange a meeting to facilitate the potential purchase and sale of Simic Galleries and allege, upon information and belief, that Plaintiff had maliciously taken steps to undermine Parker's efforts in that regard.

15.     Deny the allegations contained in paragraph 15, except again admit that

Parker wrote and emailed Exhibit 1 to Plaintiff and Binns in order to respond to Plaintiff's counterproductive actions that had undone Parker's efforts to get the parties together in order to broker the Simic Galleries sale, at a proposed purchase price of $5,000,000, which sale was not successfully pursued thereafter.

16.    Deny the allegations contained in paragraph 16, except again respectfully refer the Court to Exhibit 1 for the precise content thereof.

17.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17.

18.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18.

19.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19.

20.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20.

21.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21.

FIRST CAUSE OF ACTION
(Defamation/Slander/Libel)

22.    Defendants repeat their answers to paragraphs 1 to 21, as if fully set forth herein.

23.    Deny the allegations contained in paragraph 23.

24.    Deny the allegations contained in paragraph 24, and respectfully refer the Court to Exhibit 1 for the precise content thereof.

25.    Deny the allegations contained in paragraph 25, except admit that a copy of Exhibit 1 was emailed to Binns.

26.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 26, except deny, upon information and belief, that Exhibit 1 was the direct cause leading to the termination of Plaintiff's employment with Binns which termination was, upon information and belief, caused by many factors including, upon information and belief, Helander's failure to meet Binn's sales and revenue goals for his art company.

FIRST AFFIRMATIVE DEFENSE
(General Demurrer)

27.    The complaint fails to state a cause of action for defamation, slander or libel upon which relief can be granted against Defendants.

SECOND AFFIRMATIVE DEFENSE
(Truth)

28.    At the time Exhibit 1 was published, to Parker's knowledge and belief all statements of fact in Exhibit 1 of and concerning Plaintiff were true, or they are in fact substantially true.

THIRD AFFIRMATIVE DEFENSE
(Opinion Privilege)

29.    All statements in Exhibit 1 that are not true or substantially true statements of fact are either obvious name-calling or hyperbole that are not reasonably understood as statements of fact, or are opinions that are not provably true or false as facts.

30.    Accordingly, and to that extent, all such statements in Exhibit 1 were

Defendant Parker's opinions that are absolutely privileged under the federal and state constitutions or they are statements not otherwise legally actionable.

## FOURTH AFFIRMATIVE DEFENSE
(Constitutional Privilege for Statements Concerning a Public Figure)

31.    As a self-proclaimed "nationally recognized" artist "represented in over 50 museums," including some of the top museums in New York, as a "published author and art curator," and as a former top official of a "prestigious," nationally-renowned design school, Plaintiff is a "public figure," at least for purposes of defamation claims arising out of his art-related activities.

32.    Accordingly, in publishing Exhibit 1 to Binns, Defendants had a constitutional privilege to communicate the information contained therein, in the absence of "actual malice" as constitutionally defined, and Plaintiff has failed to plead and cannot establish Defendants' actual malice.

## FIFTH AFFIRMATIVE DEFENSE
(Common Interest Privilege – Common Law)

33.    Plaintiff, Defendant and Binns also all had a common business interest in the proposed purchase of Simic Galleries, in the meeting that was to have been held in New York to discuss that potentially lucrative business deal, and in all of Plaintiff's and Defendants' activities relating to the Simic transaction and to the parties' various other business dealings among themselves that were actively ongoing at the time Exhibit 1 was written and circulated.

34.    Accordingly, in publishing Exhibit 1 to Binns, Defendants had a qualified or conditional common law privilege to communicate the information contained therein,

and Defendants did not abuse that privilege by their limited publication of Exhibit 1 solely to Binns, a third party who, under the circumstances, also shared a common interest in that communication.

<u>SIXTH AFFIRMATIVE DEFENSE</u>
(Privilege of Self-Defense/Reply – Common Law)

35.    At the time Parker wrote Exhibit 1 and sent it to Plaintiff and Binns, upon information and belief, and as set forth with more particularity in their counterclaims hereinbelow, Plaintiff had for some time been subjecting Defendants to false and slanderous attacks that Plaintiff was communicating to various third parties, who were Defendants' business and personal associates, including to Binns.

36.    Accordingly, in publishing Exhibit 1 to Binns, Defendants had a qualified or conditional common law privilege to reply to, and to defend themselves against, those attacks.

<u>COUNTERCLAIMS</u>

Defendants Ron Parker and Parker and Parker, by their attorneys, Henry R. Kaufman, P.C., for their Counterclaims against Plaintiff and Counterclaim Defendant Bruce Helander, allege as follows:

37.    Defendants/Counterclaimants repeat their answers to paragraphs 1 to 36, as if fully set forth herein.

<u>PARTIES TO THE COUNTERCLAIMS</u>

38.    Counterclaimant Ron Parker (hereafter "Parker" or "Counterclaimant") is not only currently a resident of Pennsylvania but he has also maintained business

activities and residences in, among other places, New York City and the Palm Beaches in Florida.  Parker's businesses include not only art and art consulting, as alleged in the Complaint herein, but also involve private real estate investment.  Those business activities were generally pursued via Parker's consulting firm, originally incorporated in New York under the name Parker and Parker, Inc., and currently doing business in New York as Parker and Parker Consulting, Inc. (hereafter Counterclaimant "Parker and Parker")  Parker was also past President of two publicly-traded (NASDAQ) art companies.

39.     Counterclaim Defendant Bruce Helander (hereafter "Helander") is, upon information and belief, not only domiciled in Florida as alleged in the Complaint but, at least until recently, Helander also maintained a part-time residence in Pennsylvania where he was not only pursuing his art career and art business but also had an option to purchase an interest in The Silk Mill building (hereafter "The Silk Mill").  Upon information and belief, Helander formerly owned an art gallery in New York City (Soho) and also frequently traveled to New York, where he is represented in top museums as an artist, where he transacts art business from time to time and where, upon information and belief, he made or communicated at least some of the false and defamatory statements complained of hereinbelow.

<u>BACKGROUND OF THE COUNTERCLAIMS</u>

40.     In his Cause of Action for "Defamation/Slander/Libel" against Defendants, Helander alleges that he was injured by one email communication, written by Parker and mailed by Parker to Plaintiff on February 27, 2007, with only one copy to Don Binns (hereafter "Binns").

41.    In fact, upon information and belief, for nearly three months previous to that single defensive email, beginning in or about December of 2006, and for a time unbeknownst to Parker, Helander embarked upon a false and deliberate campaign of character assassination against Parker, that continues to this day, whose intent was nothing less than to destroy Parker's well-earned and financially-indispensable reputation in his business and social circles in Pennsylvania, New York and Florida, as well as nationally – a reputation for honor and integrity in his activities as an artist, art consultant and publisher and real estate investor as well as in his personal dealings with friends and acquaintances who are also often clients and/or potential customers or investors.

42.    Because Parker and Parker is a closely-held entity, the publication and circulation of false and defamatory statements of and concerning Parker by Helander, related to Parker's business and profession, inevitably had a damaging impact on Parker's consulting firm, Counterclaimant Parker and Parker, as well.

43.    Upon information and belief, this slanderous campaign against Parker, and Parker and Parker, was undertaken by Helander as direct and malicious retribution flowing from the ongoing business dispute between the parties involving the Silk Mill.

THE SILK MILL PROJECT AND DISPUTE

44.    In or around December 2004, Parker and Parker bought the historic Silk Mill factory in White Mill, Pennsylvania, for corporate art studios, galleries and art storage.  Throughout the events in question, and to this day, Parker and Parker is and has always been the legal owner of the Silk Mill.

45.    In the first half of 2005, Parker and the Helanders, who had been close friends and business associates in the art world for a number of years, discussed giving

Helander and his wife an option to purchase two-thirds of the Silk Mill to be converted into live-work Condos by the Helanders.

46.    On June 25, 2005, Parker and Parker and the Helanders entered into a written contract, executed by both Bruce and Claudia Helander, which established the terms and conditions for the Helanders to exercise their option.

47.    The June 25 contract envisioned that, in return for the Helanders' agreement to invest $210,000 in the Silk Mill project, and their undertaking to make certain additional payments of expenses and to provide certain ongoing services in connection with the renovation and conversion of the Silk Mill to a total of nine condominium units, on a 12-month timetable as defined in the agreement, the Helanders would, if the project was successful, and at the time of the conversion, become the owners of six units in the condominium and would also thereby have the opportunity to profit from the sale of any of their units.

48.    After execution of the June 25 agreement, the Helanders moved into one of their envisioned future units in the Silk Mill where they began to pursue their agreed renovation and development work.  By the first half of 2006, however, it was clear that the Helanders were not meeting their financial and development obligations under the June 25 agreement and that they would be unable to perform on the 12-month timetable provided in that agreement.

49.    For that reason, on March 7, 2006, the Helanders and Parker and Parker entered into a one-page written amendment to the June 25 agreement (hereafter the "March 7 amendment").  The March 7 amendment provided, among other things, that the Helanders, at their election, would be accorded up to three, 30-day extensions, of the

original 12-month deadline for completing their work on the Silk Mill and for paying the required $210,000 purchase price of the six condos.

50.      Thereafter, the Helanders requested and received the three monthly extensions as provided in the March 7 amendment.  On August 22, 2006, Parker agreed to the third and final extension.  However, the Helanders continued to fail to meet their obligations under the June 25 agreement: in particular, many of the debts the Helanders incurred in connection with their work on the condominium were (and remain to this date) unpaid and the Helanders never paid their agreed $210,000 purchase price for the six Condos.

51.      During this same period, in order to assist the Helanders, both as friends and to try to help them meet their financial obligations under the June 25 agreement, Parker undertook to advise Bruce Helander in advancing his art career and related business activities.  Indeed, Helander consulted Parker for assistance in connection with his possible affiliation as an art consultant with Binns, the sole recipient of the February 27 email, which affiliation was, upon information and belief, successfully consummated in or about October 2006.  (Specifically, Helander told Parker that he was going to ask Binns for a $60,000 annual fee and Parker recommended that he ask for $120,000.)

52.      Parker also sought to help Helander interest Binns in making an investment in the Silk Mill for the purpose of assisting in working out the Helanders' unsatisfied financial obligations under the June 25 contract and March 7 amendment, including unpaid debts to the general contractor, engineer and others.  To that end, in October 2006, Binns met with Parker and Helander in Pennsylvania to discuss Binns' art business and the Silk Mill.  Thereafter, on or about October 26, 2006, Binns offered a

proposal regarding resolution of the Silk Mill dispute; however, Binns declined to make any investment in the Silk Mill.

53.    Although they continued to discuss various opportunities in the art business, including Binn's purchasing the Parker Art Publishing Co. for $1,000,000, and the possible acquisition of the Simic Galleries for $5,000,000, which Parker and his consulting firm were attempting to broker, the parties were unable to arrive at any resolution and the Helanders continued to remain in default in their financial obligations under the June 25 agreement and the March 7 amendment.

54.    On or about November 12, 2006, the Helanders moved out of the Silk Mill, leaving behind not only the unfinished renovation, but also many substantial, unpaid debts to contractors, engineers and others, as to which liens had been, or were later, placed on the Silk Mill building, to the legal and financial detriment of Parker and Parker.  (Ultimately, Parker and Parker has had to agree to pay in excess of $50,000 in order to resolve the Helanders' unpaid bills to the general contractor and the engineering firm for the building.)

55.    Thereafter, notwithstanding these unresolved problems, and throughout the balance of 2006 and into January and February of 2007, Parker continued his good faith efforts to attempt to assist Helander in his art business, in recognition of their longstanding friendship, and also in order that Helander might, in some fashion, meet his unpaid financial obligations to Parker and Parker in connection with the Silk Mill project. These efforts included Parker's continued efforts to interest Binns in the Silk Mill, efforts to broker Binns' multi-million dollar acquisition of Simic Galleries (as to which Bruce Helander demanded a secret kickback from Parker for any sale to Binns), and additional

offers to pursue other lucrative business opportunities, including the sale of Parker's publishing company to Binns.

56.     Despite all of Parker's efforts to assist Helander in improving his financial situation, and to work out his unpaid obligations in relation to the Silk Mill, during this same period, instead of welcoming and attempting in good faith to pursue such opportunities, upon information and belief, Helander embarked upon a malicious campaign of character assassination against Parker and his consulting firm.

57.     Not surprisingly, despite all of Parker's efforts, none of the business prospects Parker sought to pursue bore fruit and, in particular, the proposed Simic Gallery purchase and sale, that had the potential to be a very lucrative deal for all concerned, came to an abrupt end when, as a direct result of the Helander's persistent defamations, Binns refused to further involve Parker in the discussions.

58.     Ultimately, two lawsuits were filed asserting competing legal claims regarding the Silk Mill, the first commenced on or about August 1, 2007, by Helander against Parker and Parker and Parker, and the second, on or about August 3, 2007, by Parker and Parker against the Helanders, which suits remain unresolved as of the date of these Counterclaims.  In lieu of resolving the underlying real estate dispute and those Pennsylvania state court actions, on September 14, 2007, Helander filed this separate federal action for defamation/slander/libel based on Defendants' circulation of a single email to one third party in the context of Parker's ongoing effort to work out the Silk Mill dispute and create new business opportunities for all concerned.

<u>AS AND FOR A FIRST COUNTERCLAIM</u>
(Defamations Communicated by Bruce Helander to Don Binns)

59.     Defendants/Counterclaimants repeat the allegations contained in paragraphs 38 to 58, as if fully set forth herein.

60.     Upon information and belief, beginning in or about December 2006, and continuing at least through late February 2007, culminating with Binns refusal to involve Parker and Parker in the potentially lucrative Simic Galleries discussions, Helander made numerous false and defamatory statements of fact to Binns concerning Parker.

61.     Upon information and belief Helander stated to Binns, among other things, that "Ron Parker is a liar," that "Parker is unethical in his business practices" and that Parker "cannot be trusted in his business dealings, even with friends," among other words to similar effect.

62.     Upon information and belief Helander also specifically told Binns that Parker "cheated us [Helander and his wife] out of the money we invested in the Silk Mill project" and that Parker unjustifiably "caused our financial problems" because he wrongfully "refused to return the money" that the Helanders had invested in the Silk Mill, among other words to similar effect.  In making such statements, upon information and belief, Helander never acknowledged, and/or he falsely misrepresented the facts regarding, his legal obligations and Parker and Parkers' under the June 25 agreement and March 7 amendment, thereby enhancing the defamatory meaning and injurious impact of the foregoing false statements.  In fact, by his own subsequent admission, there is no legal basis for Helander to claim that he is owed any money by Parker and Parker.

63.     At the time each of the foregoing defamatory statements were made, Helander knew those statements were false, or recklessly disregarded their falsity.

64.    At the time each of the foregoing knowingly or recklessly false and defamatory statements were made, Helander was also in fact motivated by spite and ill will toward Counterclaimants in communicating such statements to Binns.

65.    The foregoing knowingly false statements were slanderous per se in that they attributed to Parker, and thereby also to Parker and Parker, a lack of morals or integrity in their business and professional dealings.

66.    The foregoing statements not only caused the general damage to the Counterclaimants' reputations that can be presumed from such per se defamations, but they also in fact caused substantial, compensable economic harm to Counterclaimants in their art consulting and real estate businesses.

67.    Moreover, in the case of the foregoing defamatory statements to Binns, Helander also caused Counterclaimants special damages of at least the $250,000 in lost commissions that Parker would have earned had the Simic Gallery purchase been consummated by Binns at the proposed $5,000,000 sale price, plus additional special damages for other lost business opportunities, including the $1,000,000 sale of the Parker Art Publishing Co.

68.    Finally, because the foregoing false, defamatory and injurious statements by Helander to Binns were made with both actual and common law malice, they are also subject, over and above appropriate compensation, to an award of punitive damages.

<u>AS AND FOR A SECOND COUNTERCLAIM</u>
(Defamations Communicated by Helander to James Loeschen)

69.    Defendants/Counterclaimants repeat the allegations contained in paragraphs 38 to 68, as if fully set forth herein.

70.     Upon information and belief, on or about December 12, 2006, Helander made various false and defamatory statements of and concerning Counterclaimants to James Loeschen, a mutual friend of Parker and Helander.

71.     Upon information and belief Helander stated to Loeschen that "Ron Parker is a liar," that "Parker is unethical in his business practices," and that Parker "cannot be trusted in his business dealings, even with friends," among other words to similar effect.

72.     Upon information and belief Helander also told Loeschen, specifically, that the Parkers "cheated us out of the money we invested in the Silk Mill project" and that the Parkers unjustifiably "caused our financial problems" because they wrongfully "refused to return the money that we [the Helanders] invested in the Silk Mill," among other words to similar effect.

73.     At the time each of the foregoing false and defamatory statements were made, Helander knew those statements were false, or recklessly disregarded their falsity.

74.     At the time each of the foregoing knowingly or recklessly false and defamatory statements were made, Helander was in fact motivated by spite and ill will toward Counterclaimants in communicating such statements to Loeschen.   In fact, upon information and belief, at the time he made the foregoing false and defamatory statements, Helander specifically stated to Loeschen that: "I [Helander] am going to ruin Ron Parker in Palm Beach."

75.     The foregoing knowingly false statements were slanderous per se in that they attributed to Parker, and thereby also his consulting firm, a lack of morals or integrity in their business and professional dealings.

76.     The foregoing statements not only caused the general damage to the

Counterclaimants' reputation that can be presumed from such per se defamations, but they also in fact caused substantial, compensable economic harm to Counterclaimants in their art consulting and real estate businesses.

77.    In addition, because the foregoing false, defamatory and injurious statements by Helander to Loeschen were made with both actual and common law malice, they are also subject, over and above appropriate compensation, to an award of punitive damages.

<u>AS AND FOR ADDITIONAL COUNTERCLAIMS</u>
(Defamations Communicated by Helander to
Other Business Associates, Art Collectors and Friends of Counterclaimants)

78.    Defendants/Counterclaimants repeat the allegations contained in paragraphs 38 to 77, as if fully set forth herein.

79.    Upon information and belief, beginning in or about December 2006, and continuing to date, Helander has made similar false and defamatory statements, of and concerning Counterclaimants, to numerous other persons who had, theretofore, been longstanding friends, art collectors and/or business associates of Counterclaimants in New York, Pennsylvania and in particular in the Palm Beach community in Florida, where many of the recipients of those statements reside, and with whom Counterclaimants would otherwise have had present and future opportunities for social interaction and potential art and real estate business dealings.  In fact, it is fair to state that every social contact known to Parker in the art community is a potential buyer of art because of the personal nature of the business and the fact that it is built on trust – trust that has been systematically undermined by Helander in the course of his defamatory campaign against the Counterclaimants.

80.    The friends, art collectors, and/or business associates to whom such false and defamatory statements were made include, but are not limited to, the following:

- Harry Anderson and Smokey Kittner, mutual friends and artists.

- Paul and Irene Fisher, gallery owners.

- Cheryl Gowdy, collector of Parker's art work and daughter of Kurt Gowdy.

- Richard Kaplan and Edwina Sandys, well known architect and artist in Palm Beach, respectively.  (Sandys is Winston Churchill's granddaughter.)

- Lee Kvarnberg, Pennsylvania architect involved in the Silk Mill project.

- Jim Pappas, wealthy art collector and real estate developer who previously enlisted Parker's help to sell a $650,000 sculpture.

- Bonnie Roseman and Tony Messina, mutual friends.

- Robert and Biba St. Croix, artists and gallery owners.

- Bruce Sutka, Palm Beach business person and prominent social personality.

- Ugel Actinez, a Palm Beach businessman who at one point was going to become Helander's business partner in developing the Silk Mill Condos.

- Raul Vega and Michael Levine, friends and previous purchasers of art and real estate from Counterclaimants.

- Bryan Walsh, director of Gasiunasen Gallery, Palm Beach.

- Lorie Welteroth, Palm Beach socialite and art collector.

81.    Upon information and belief Helander stated to some or all of these persons that "Ron Parker is a liar," that "Parker is unethical in his business practices," and that Parker "cannot be trusted in his business dealings, even with friends," among other words to similar effect.

82.    Upon information and belief Helander also told these persons, specifically, that the Parkers "cheated us out of the money we invested in the Silk Mill project" and

that the Parkers unjustifiably "caused our financial problems" because they wrongfully "refused to return the money that we [the Helanders] invested in the Silk Mill," among other words to similar effect.

83.    At the time each of the foregoing false and defamatory statements were made, the Counterclaim Defendants knew those statements were false, or recklessly disregarded their falsity.

84.    At the time each of the foregoing knowingly or recklessly false and defamatory statements were made, the Counterclaim Defendants were in fact motivated by spite and ill will toward Counterclaimants in communicating such statements to those other friends and/or business associates of Counterclaimants.

85.    The foregoing knowingly false statements were slanderous per se in that they attributed to Parker, and thereby also his consulting firm, a lack of morals or integrity in their business and professional dealings.

86.    The foregoing statements not only caused the general damage to the Counterclaimants' reputation that can be presumed from such per se defamations, but they also in fact caused substantial, compensable economic harm to Counterclaimants in their art consulting and real estate businesses.

87.    In addition, because the foregoing false, defamatory and injurious statements by Helander to such other persons were made with both actual and common law malice, they are also subject, over and above appropriate compensation, to an award of punitive damages.

WHEREFORE, Defendants/Counterclaimants demand judgment:

(a)    Dismissing Plaintiff's Cause of Action against Defendants for

defamation/slander/libel in their entirety;

 (b) As to Defendants' Counterclaims:

  (i) On the first counterclaim for defamatory statements made by Helander to Don Binns, awarding to Counterclaimants special damages for lost commissions and business opportunities in the amount of at least $1,250,000, plus general, compensatory and punitive damages;

  (ii) On the second counterclaim for defamatory statements made by Helander to James Loeschen, awarding to Counterclaimants general, compensatory and punitive damages;

  (iii) On the additional counterclaims for defamatory statements made by Helander to other business associates, art collectors and friends, awarding to Counterclaimants general, compensatory and punitive damages for each such defamation;

 (c) Granting to Defendants/Counterclaimants such other and further relief as this Court may deem appropriate.

Dated: New York, New York
  November 28, 2007

      _____/s/_____
      Henry R. Kaufman, P.C.
      Henry R. Kaufman (HK-7283)
      Attorneys for Defendants/Counterclaimants
      11 East 44th Street, Suite 900
      New York, NY 10017
      (212) 880-0842

To:

David C. Holland, Esq.
The Law Offices of Michael Kennedy, P.C.
419 Park Avenue South, 16th Floor
New York, NY 10016
Attorneys for Plaintiff/Counterclaim Defendant

# EXHIBIT 1

**RON PARKER**

| | |
|---|---|
| **From:** | "RON PARKER" <rkparker@ptd.net> |
| **To:** | "bruce helander" <brucehelander1@bellsouth.net> |
| **Cc:** | <dbinns@aol.com> |
| **Sent:** | Tuesday, February 27, 2007 9:03 PM |
| **Subject:** | stupidity |

Bruce, what a stupid email to send Mario.

If Don does not want me at a meeting, you should tell me and I will not be there. In fact, I am now not going to ny.

What you have demonstrated is that your poisoning Don re Ron was so negative and your attempts to neutralize it were so pathetic, that you are, again, another failure in trying to structure a deal to get you out of your self imposed crisis.

Since I never told Mario of our conflict, in order to protect you, I will now be free to tell Mario and anyone else what a lying, irresponsible bastard you are.

Don and his two artists are doomed as anyone can see. Your only hope was to create something bigger and better quickly. Or perhaps to milk

Don as long as possible. Don should ask Paul Fisher what his DC sales have been each of the last five years. He is third rate in the sales department.

All of your acting so 'busy' working is a joke. You would not know a priority if it bit you in the butt......why don't we run off to Dubai and waste some time and money; how about a Playboy party to network; better still, let's get some Robb Report and Banking clients together....or how about this......let's have a party for Tippy!!

Your history is about smoke and mirrors....not substance. Stop running around in circles, stop rearranging the deck chairs on the Titanic, and knock on some fucking gallery doors and make a sale!!!

You will fail at art expo, you will fail in making significant sales and Don will terminate you. You don't know the commercial art business, you don't have any personal contacts with the players and you don't have any valid art to sell them.

You did not know what the fuck you were doing in the silk mill condo conversion, you pissed your money away, and then you blame me for your stupid decisions. Your last stupid acts are to commit perjury before the courts of PA, to steal money from your 'friend' Milo, to not pay your hourly worker, your architect, your engineer and your contractor. You the big, ego developer who did not know his ass from his elbow and now you want to blame me for your failures and to make me the evil one. Don is not stupid; if he saw all of the contracts, amendments and paper trail, he would know who the bull shitter and lying evil person is----you not me.

Take responsibility for your life. Get focused. You are running around wasting time and Don's money. I think 40 years of daily pot smoking has ruined most of your gray matter........I simply cannot believe how a guy as nice as you are in person could be so irresponsible with your (and Don's) time and money.

Did you ever figure out why the Armory fired you?  Why you really have never made any serious money in your life?  Why your gallery investor had to sue you?  Why your investors lost $11,000,000 on your magazine, ArtExpress?

Your behavior toward me and you mismanagement of the silk mill project is pathetic.  More pathetic, however, is that I alone gave you an opportunity with Mario  and Rami to launch you and Don into the real art business by buying a profitable art company.....and you even screw that up.......self destructive ? or incompetent ?

Tell the truth for a change and maybe you have a future if you    can focus and sell rather  waste your time and Don's money doing that dumb Palm Beach p.r. stuff which does not result in sales.

Oh, and also take responsibility for your decisions.........neither the devil nor Ron made you do anything.  You are 60 years old and you made all of the decisions that caused you to repeatedly screw up your life.

Ron